NATIONAL CASUALTY COMPANY v. MARTHA ZMIJEWSKI, *et vir*

196 So. 587
En Banc
Opinion Filed June 4, 1940
Rehearing Denied June 24, 1940

*Harry T. Gray, Marks, Marks, Holt, Gray & Yates,* for Plaintiff in Error;

*T. Rogero Mickler, Bertram C. Mickler* and *Mickler & Mickler,* for Defendant in Error.

CHAPMAN, J.—This writ of error brings here for review a final judgment for the plaintiff below entered in the Circuit Court of St. Johns County, Florida. The suit was brought to recover on an accident policy issued by National Casualty Company on the life of Walter Mitchell, who was killed or received injuries from which he died, on the 9th day of March, 1938, while standing on one of the concrete driveways of a filling station, located on the corner at the intersection of San Marco Avenue and North Park Avenue of the City of St. Augustine.

The accident policy sued upon in this case insured Walter Mitchell against death * * * through external, violent and accidental means while walking or standing on a public highway by a moving vehicle propelled by gasoline. San Marco Avenue in the City of St. Augustine, at the point where insured was struck and killed, is in part State Road No. 4 and United States Highway No. 1. It is admitted by the parties that the policy sued upon was in full force and effect when Walter Mitchell was struck and killed by a gasoline-propelled automobile.

The reason assigned for the non payment of the policy

is that the insured, Walter Mitchell, was not struck by a gasoline-propelled automobile or moving vehicle while standing or walking on a public highway, but on the contrary, the injuries were sustained by the insured when he was standing on private property abutting a highway and the private property was at the time being used as a filling station.

The plaintiff below offered in evidence: (a) the policy; (b) stipulation of counsel as to facts; (c) map or diagram of the *locus in quo;* (d) testimony of Mr. Powell, the operator of the filling station near where Walter Mitchell received his fatal injuries. Pertinent parts of the operator's testimony are, viz.:

"Q. From your observation of the station, was it intended that the sidewalks were taken up and the curbing taken up, and the paving run out to become part of the two avenues?

"A. Yes, sir. There is no sidewalk at all, just use the street as the sidewalk.

"Q. Will you tell me what use is made of the grounds in front of your service station building by automobile traffic?

"A. Well, they use it for service and everything, they use it for a turntable, people cut through with bicycles, and cars going to and from work, people cut through there, and everything else. They use it about as much as San Marco. It is a good place to turn around.

"Q. How long have you been operating that filling station?

"A. Two years and three months.

"Q. How long has it been a filling station?

"A. Ten or fifteen years.

"Q. Has that pavement been there for ten or fifteen years as it now running out to the avenues?

"A. Yes sir.

"Q. It was closed one time and people used for a highway?

"A. Yes sir.

"Q. The building was closed, but the station grounds were open?

"A. Yes sir.

"Q. I understood you to say people coming to and from work cut across the property of the station grounds as a short cut between San Marco Avenue and Park Avenue?

"A. Yes sir, morning and night, and after I close up people pass through there, back and forth.

"Q. Do you live across the street and can you see people using it at night after the station is closed?

"A. Yes sir.

"Q. People on bicycles also use it for a short cut and driveway?

"A. Yes sir, they use it too much.

"Q. And how about automobiles and trucks?

"A. They are in and out all the time. I reckon I walk ten miles a day from somebody running through instead of stopping.

"Q. False alarm?

"A. Yes sir.

"Q. People use it practically as part of the highway in going from one avenue to the other?

"A. Yes sir.

"Q. Or in going up and down the avenues and turning around?

"A. Yes sir, more than I get business out of.

"Q. Looking east on North Park Avenue, what is that section used for?

"A. That's a residential section.

"Q. That is a regularly paved street in the City of St. Augustine?

'A. Yes sir.

"Q. And San Marco Avenue is one of the main streets in the City of St. Augustine?

"A. Yes sir.

"Q. And San Marco also at that point is part of U. S. Highway Number 1 and State of Florida Number 4?

"A. Yes sir, No. 48 and No. 4, junction of No. 48 and No. 4. * * *

"Q. Did you know Walter Mitchell?

"A. Yes sir.

"Q. Was he injured at that time?

"A. Yes sir.

"Q. He was struck by an automobile that ran in there?

"A. Yes sir.

"Q. Where did the car come from?

"A. Off San Marco Avenue, coming south.

"Q. The car was coming south on San Marco and wasn't there a previous collision over there on San Marco Avenue?

"A. Yes sir, a bicycle came out of U. S. 48—

"Q. Out of Horn Road?

"A. Yes sir..

"Q. And the bicycle and this car collided?

"A. Yes sir.

"Q. And after that this car swerved across into your filling station?

"A. Yes sir.

"Q. And is that when it struck Walter Mitchell?

"A. Yes sir.

"Q. Was he standing, or where was he at that time?

"A. He just drove up about a couple of minutes before and he stopped somewhere in the vicinity of this pump, four or five feet, close to here (indicating on plat), and the boy working for me was airing his tires, and the car come in and he had his back to it and didn't see it.

"Q. Is that the pump that had the air tube from which Walter Mitchell was getting air for his bicycle at the time of the accident?

"A. Yes sir. At the other pump there was a Ford V-8. He had to stop there.

"Q. How far from that pump is your property line as shown on the plat?

"A. About a foot or two, I don't know exactly. It's almost on the line.

"Q. Are you able to mark on that plat where you think the boy was standing when he was struck, or within what area he was standing?

"A. Almost to the exact spot, yes sir.

"Q. I want you to show as near as you can recall where he was standing when he was first hit there, and if you are not definite as to exactly where, then about where.

"A. He came down San Marco Avenue, and he came in here and the bicycle was kind of cattacornered, and my boy was putting air in his tires, right close to the bicycle (Witness drew a straight line and a dot where the boy and bicycle were standing.) This boy was putting air in his tires.

"Q. Do you know whether or not before the accident he was actually on the east side of that line, or is it possible he could have been on the west side, or just on the line?

"A. I couldn't say whether he was on the line, right on the line, or two or three inches off, or a foot.

"Q. But it was within the radius of the line and a foot or two is your answer?

"A. It was between the line and the pump, it might have been a few inches either way.

"Q. Is it correct that the location of the pumps on your property form as you say three natural driveways from one of these avenues to the other?

"A. Yes sir."

There was no evidence offered by the defendant, but a motion for a directed verdict in its behalf was made upon the ground that the evidence adduced was legally insufficient to sustain a verdict for the plaintiff and the same was by the trial court denied. Counsel for plaintiff below moved the court for an order directing the jury to find or render a verdict for the plaintiff and the said motion was by the trial court granted. Defendant's motion for a new trial was denied.

The accident policy sued upon indemnified the insured against injuries sustained in a sum not exceeding $1,000.00 when walking or standing on a public highway by a moving vehicle. The record here shows the insured received injuries, causing his death, from a moving vehicle when he was standing on or near the dividing line of the public highway and at a place not exceeding two feet therefrom over on private property which had been used by motorists and the general public for more than ten years as a filling station. Did the injuries of the insured occur on a public highway within the meaning of the policy?

The rule established and adopted by this Court for the construction and interpretation of insurance contracts is that the policy must be liberally construed in favor of the insured so as not to defeat, without a plain necessity, his claim to the indemnity which the policy was to secure.

Where the terms of a policy are of doubtful meaning, a construction most favorable to the insured should be adopted. The provisions of insurance policies must be considered in the light of the intention of the parties under the intendments of the law that the policy should afford protection when it can legally and fairly do so. An insurance contract must be liberally construed in favor of the insured so as not unnecessarily to defeat his claim to the indemnity which he intended to obtain, and ambiguous terms are to be fairly construed in favor of the insured. See Franklin Life Ins. Co. v. Tharpe, 130 Fla. 546, 178 So. 300; New York Life Ins. Co. v. Kincaid, 122 Fla. 283, 165 So. 553; New England Mutual Life Ins. Co. v. Huckins, 127 Fla. 540; 173 So. 696; National Surety Co. v. Williams, 74 Fla. 446, 77 So. 212; Aetna Casualty & Surety Co. v. Cartmel, 87 Fla. 495, 100 So. 802, 35 A. L. R. 1013.

It is the contention of counsel for plaintiff in error that the plaintiff below failed to adduce sufficient testimony to show that Walter Mitchell received injuries while walking or standing on a public highway. It is fundamental that this burden of proof rested on the plaintiff. The line dividing the highway and the filling station property, according to the witness Powell, was about where the air pump was located and where the deceased was engaged in placing air in his bicycle tires. The deceased was at this point when struck by the motor vehicle. The witness thought the deceased when struck could have been a few inches on the public highway or a few inches from the line over on private property. The trial court hearing the testimony granted plaintiff's motion for a directed verdict and entertained the view, no doubt, that the deceased was walking or standing on the public highway when injured. There is evidence in the record to sustain such a conclusion.

Likewise there is evidence in the record that the deceased

was standing or walking near the line of the public highway and less than two feet therefrom over on private property used as a filling station when injured. The right of the public to pass and repass at the point where the deceased was standing when injured had been fully established for some ten or fifteen years. It is quite true that the property was privately owned but the right of the general public to use the same as part of the highway where the injury occurred is not controverted or disputed and this right for use without restriction had been enjoyed by the general public for years. See Couture v. County of Dade, 93 Fla. 342, 112 So. 75.

We find no error in the record and the judgment appealed from is hereby affirmed.

TERRELL, C. J., WHITFIELD and BUFORD, J. J., concur.

BROWN and THOMAS, J. J., dissent.